# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **ALFONZA HARDY GREENHILL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:16CV00068 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **HAROLD W. CLARKE, ET AL.,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendants. | ) | |

*Alfonza Hardy Greenhill, Pro Se Plaintiff; Laura H. Cahill, Assistant Attorney General, Office of the Attorney General of Virginia, Richmond, Virginia, for Defendants.*

The plaintiff, Alfonza Hardy Greenhill, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc to 2000cc-5. By Opinion and Order entered in this case on December 15, 2017, ECF No. 53, I granted summary judgment for the defendant prison officials as to certain of Greenhill's claims. The matter is now before me on the defendants' Supplemental Motion for Summary Judgment on Greenhill's remaining claims for injunctive relief under RLUIPA regarding his Muslim religious practices of participating in weekly group Jum'ah services and wearing a four-inch beard.[1] After review of the

---

[1] The defendants are Harold Clarke, Director, A. David Robinson, Chief of Operations, and Earl Barksdale, former warden. In support of their motion, they offer

record, I conclude that the defendants' are entitled to summary judgment as a matter of law.

## I. BACKGROUND.

Greenhill is in the custody of the Virginia Department of Corrections ("VDOC"), serving a prison term of fifteen years and forty days.[2] He states that he has been a Muslim since 2000. He asserts that his Muslim faith requires him to participate in a weekly Jum'ah group religious service with at least three other Muslims. Greenhill also states that his religious beliefs require him to grow and keep his beard trimmed to the length of his fist, or about four inches long. He has claimed that he is confined in an administrative segregation unit where policies prevent him from participating in Jum'ah services, in person or via television. He also alleges that wearing a four-inch beard, in violation of prison grooming policies, will prevent him from moving to less restrictive conditions and from obtaining a job so he could purchase a television for Jum'ah participation. He claims that the defendants' policies and actions under those policies have substantially burdened his religious practices, and he seeks injunctive relief under RLUIPA.

affidavits from Unit Manager Larry Collins and former Unit Manager A. Duncan, with supporting documentation.

[2] This summary of facts is taken from the parties' submissions as a whole and is undisputed, except where otherwise noted.

A.  Participation in Group Religious Services.

VDOC policies have established "protocols to provide reasonable opportunities for offenders incarcerated in [VDOC] facilities to voluntarily pursue religious beliefs and practices subject to concerns regarding facility security, safety, order, space, and resources."  Mem. Supp. Mot. Summ. J. Ex. 2, Operating Procedure ("OP") 841.3(I), ECF No. 26-2.  Inmates in Security Levels 1 through 5 (with Level 1 depicting the lowest measure of security) may attend group religious worship services with other inmates, subject to varying degrees of staff monitoring based on inmates' security levels; time, space, and staffing constraints; and other needs of orderly prison operations.  OP 841.3(IV)(A)(7).  After Greenhill entered VDOC custody in 2007, he was assigned to Deep Meadows Correctional Center, a Security Level 2 facility, and then to Sussex II State Prison, a Level 4 facility.

Because Greenhill was found guilty of a series of institutional disciplinary infractions in 2008, however, he was transferred to Red Onion State Prison ("Red Onion") and was reclassified as a Security Level S.  Level S is a security status reserved for inmates who must be managed in a segregation setting, apart from other inmates, for reasons of security and order.[3]  To earn eligibility for less

---

[3]  According to the VDOC operating procedure for security level classification, inmates are classified to Level S based on "segregation qualifiers," including gang activity or leadership, manipulating staff or displaying predatory behavior, or acts posing a "threat level too great for the safety and security of a lower level institution."  *See* OP

restrictive classifications, a Level S inmate must complete the various requirements of the Segregation Reduction Step-Down Program ("Step-Down") set out in VDOC Operating Procedure ("OP") 830.A.[4]

In February 2013, when the current Step-Down Program policy took effect, the Institutional Classification Authority ("ICA") at Red Onion recommended Greenhill for assignment to the Structured Living Phase 1 pod, a general population setting rather than segregation. In this status under OP 830.A, inmates can have jobs and use a television in their cells, among other privileges. Greenhill refused this general population assignment and remained in segregation, awaiting reclassification. In March 2013, the ICA again reviewed his housing status and noted that he had "advised staff that he would prefer to remain in segregation rather than go into a Phase 1 housing assignment." Mem. Supp. Mot. Summ. J. Ex. 1, Duncan Aff. ¶ 10, ECF No. 26-1.

Ultimately, Greenhill was assigned to SM-0 status, the most restrictive step of the program's Special Management pathway of the program. SM status is reserved for inmates with a history of disruptive behavior, fighting, and/or violence toward staff or other inmates for whom reasonable interventions at lower security

---

830.2(IV)(G)(2), *VDOC Procedures* (Apr. 1, 2018) https://vadoc.virginia.gov/about/procedures/ documents/ 800/830-2.pdf.

[4] My previous Opinion described Level S and the Step-Down procedures in detail and need not be repeated.

level facilities have not been successful in eliminating such disruptive and dangerous behaviors. An SM-0 inmate cannot participate in group activities with other inmates, possess a personal television in his cell, or hold a job. In May 2014, Greenhill was assigned to the Secure Integration Pod Phase 1, where the privileges again included job possibilities and possessing a television in one's cell. In September 2015, after Greenhill had incurred ten institutional disciplinary charges in two years, officials reassigned him SM-0 status.

The Step-Down Program requires inmates to learn and display new thought patterns and social skills. As they do so, they earn advancement to lower, less restrictive housing assignments and greater privileges, in a manner that maintains public, staff, and inmate safety. To progress in the program and attain SM-1 status, Greenhill must complete designated portions of the seven workbooks in the *Challenge Series*, which teach positive thinking patterns. He must also remain free of disciplinary charges and earn good weekly behavior ratings in cell maintenance, personal hygiene, standing for count, and respect. When an inmate incurs new disciplinary charges or continually fails to meet positive behavior goals, evaluators may find that he has not learned the intended lessons and require him to remain in his current step or start the program anew.

Since his assignment to SM-0 in September 2015, Greenhill has incurred nine additional institutional disciplinary charges. He has, at times, participated in

Step-Down programming, and he completed the Orientation Book of the *Challenge Series* on November 15, 2017. A month later, however, Greenhill incurred another disciplinary charge for tampering with a security device. At the time the parties filed the pleadings currently before me for review, in January and February 2018, Greenhill remained at SM-0 status.

Like all segregation status inmates, Level S inmates cannot congregate with other inmates, even for religious services. A Level S inmate who has progressed beyond SM-0 status to SM-1 or SM-2, however, can participate in the weekly Jum'ah group religious service via a closed circuit television broadcast. Greenhill does not own a personal television, and the Step-Down pods are not equipped with closed circuit televisions for inmates' use. Greenhill has asked prison officials to provide him with a television for Jum'ah purposes only — in his cell, in the pod, or in a nearby classroom. Although the defendants admit that officials could physically provide any of these accommodations to Greenhill, they have denied his requests because of his security level and housing assignment to SM-0.

Instead, officials have advised Greenhill to remain infraction free and participate consistently in the Step-Down requirements to earn eligibility for advancement past SM-0. When he achieves SM-1 or SM-2, he can be considered for a paid job and save money toward purchasing a personal television set from the commissary for $212. According to the unit managers, the Step-Down procedures

use television access as a motivational tool. Only inmates in SM-0 or IM-0 (the lowest step in the Intensive Management pathway of the Step-Down Program) are denied television access. "There are incentives built into the Step-Down Program which we hope will motivate the offenders to participate and work toward long-term behavioral changes, new thought patterns and social skills." Duncan Aff. ¶ 13, ECF No. 26-1. "An offender's ability to possess a television inside his cell is a privilege that most inmates covet, and it is one of the biggest motivators for encouraging offenders to participate in the Step-Down program." Collins Aff. ¶ 10, ECF No. 55-1.

## B. Beard Length Policies.

The VDOC grooming policy, OP 864.1(I), establishes uniform personal grooming standards for inmates "to facilitate the identification of offenders and to promote safety, security, and sanitation." *Id*. at Enclosure D. "Hair styles and beards that could conceal contraband, promote identification with gangs, create a health, hygiene, or sanitation hazard, or that could significantly compromise the ability to identify an offender are not allowed." *Id*. at ¶ 13. The policy now requires inmates to keep their beards trimmed to no longer than half an inch.

When an inmate becomes noncompliant with the OP 864.1 grooming requirements, he will be ordered to comply. If he refuses, he will be charged with a policy offense, and receive disciplinary procedural protections required by the

VDOC's disciplinary policy. No inmate will receive more than one grooming charge for each separate violation incident, and all inmates who remain noncompliant with grooming standards will stay in segregated housing until they do comply. As of November 6, 2017, a Level S inmate participating in the Step-Down Program who refuses to comply with VDOC grooming standards on the basis of religious principles will receive only one charge and "will **not** receive a 'poor' in the personal hygiene category" of the weekly behavior ratings. *Id.* at ¶ 16.

As OP 864.1 now stands, an inmate "is not prevented from progressing through the Step-Down Program for refusing to comply with the grooming policy due to his religious beliefs." *Id.* If he participates in that program and earns assignment to a less restrictive step, he can be considered for a pod job without shaving his beard. He "is not required to shave his beard in order to obtain a pod job." *Id.* at ¶ 12.

Furthermore, inmates who are noncompliant with OP 864.1 hair and beard restrictions for religious reasons may qualify for assignment to the Grooming Policy Violators Housing Unit ("VHU").[5] The VHU is a special management housing unit, but allows its inmates privileges that Level S inmates do not have. Among other benefits, the VHU housing areas are equipped with communal

---

[5] The VHU is actually located at the nearby Wallens Ridge State Prison, a similar high security prison.

televisions with in-cell volume controls to allow for inmates' visual participation in weekly Jum'ah services via a closed circuit television broadcast.

To be found eligible for the VHU, Greenhill must meet the following criteria: (a) be convicted of a grooming policy violation and (b) have "[n]o past history of disruptive or assaultive behavior as determined by review team." *Id*. at Enclosure D, OP 864.1(V)(C)(1). A recommendation for assignment to the VHU must be reviewed by the ICA at Red Onion and the VDOC Central Classification Services ("CCS"), with final decisions or exceptions approved by Facility Unit Head and the Regional Operations Chief.

### C. Greenhill's Allegations and Claims.

Greenhill claims that "since the defendants have made [his] visual access to Jum'ah contingent upon ownership of a personal television [he does] not own and cannot afford to purchase, they have substantially burdened [his] religious exercise of Jum'ah" in SM-0. Greenhill Decl. ¶ 5, ECF No. 57. He states that even if he can move to a status allowing employment, this burden on his religious practice will continue. According to Greenhill, the pay rate for pod jobs is 20 to 35 cents per hour. With other necessary expenses including hygiene and stationery items and medical expenses, it may be years before he could save $212 to buy a television. He states that "Jum'ah is a central tenet of Islam; any adult Muslim

male who is absent therefore incurs a terrible sin and is deprived of the opportunity to acquire many blessings." Compl. ¶ 9, ECF No. 1.

Greenhill also claims that because his religion requires him to maintain a beard that exceeds the length requirements of OP 864.1, he will be maintained indefinitely in segregated confinement. This housing status deprives him of many activities available to VDOC inmates in a general population setting, including: Jum'ah participation, institutional employment, recreational activities like soccer and basketball, and earning good conduct time to shorten his term of confinement.

Greenhill contends that factors beyond his control prevent his qualification to enter the VHU, where he could wear his beard and participate in the televised Jum'ah. First, his assaultive disciplinary history precludes him from VHU eligibility unless three levels of administrative reviewers make an exception and approve him for VHU admittance. Second, he has not yet received a grooming charge, another prerequisite for VHU consideration.[6]

To address these alleged violation of his rights under RLUIPA, Greenhill asserts that I should order prison officials to "accommodate [him] with the means

---

[6] In his responsive pleadings, Greenhill complains that Unit Manager Collins, who is not a defendant in this case, has refused to charge him with a disciplinary offense for failing to comply with grooming policy requirement for religious reasons. Collins allegedly believes that the VHU is reserved for Rastafarian inmates and, on that basis, such charges are reserved for Rastafarian inmates. Greenhill also claims that his religion forbids charging a fee for Jum'ah participation, but that VDOC regulations essentially require a fee (the cost of a personal television set) for Greenhill to participate in Jum'ah. I find these allegations to be new claims, not properly presented in the Complaint or by timely amendment. Therefore, I do not consider these issues to be part of this case.

to visually access Jum'ah or allow him bodily access thereto." *Id*. at ¶ 46. He also asks for an order allowing him to maintain a four-inch beard "without incurring disciplinary measures as a result." *Id.*

## II. DISCUSSION.

### A. Summary Judgment Standard of Review.

A court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* I must draw all reasonable inferences from the facts in favor of Greenhill, the nonmoving party. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). To survive the defendants' motion, however, Greenhill must present sufficient evidence that could carry the burden of proof of his claims at trial. *Id.* He "may not rest upon the mere allegations or denials of his pleading, but must set

forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477

U.S. at 248.[7]

## B. RLUIPA.

RLUIPA provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest."

§ 2000cc-1(a). Congress enacted RLUIPA with the express intention to provide

greater protections for inmates' religious exercise than does the First Amendment

as interpreted by the Supreme Court. *Holt v. Hobbs*, 135 S. Ct. 853, 860 (2015).

Nevertheless, context matters. An inmate's right to religious exercise under

RLUIPA must be balanced against the VDOC's institutional needs of security,

discipline, and general administration. *Cutter v. Wilkinson*, 544 U.S. 709, 722

(2005). RLUIPA cannot be applied so as "to elevate accommodation of religious

observances over an institution's need to maintain order and safety." *Id.* Thus,

any religious "accommodation must be measured so that it does not override other

---

[7] I have omitted internal quotation marks, alterations, and citations here and throughout this Opinion, unless otherwise noted.

significant interests," with "particular sensitivity to security concerns." *Id.* at 722; *Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006).

### 1. Substantial Burden.

Under the first facet of the RLUIPA analysis, the inmate "bears the initial burden to demonstrate that the prison's policy exacts a substantial burden on [his] religious exercise." *Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015). For purposes of a RLUIPA claim, "a substantial burden on religious exercise occurs when a state or local government, through act or omission, puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Lovelace*, 472 F.3d at 187.

The defendants argue that Greenhill has *not* met his initial burden to show that his inability to attend or view group religious services in SM-0 status has substantially burdened his religious practice, since that status is temporary. I find otherwise. Greenhill contends that even a temporary inability to participate in group Jum'ah services, in person or via the broadcast, deprives him of a central practice of his Muslim beliefs and, thereby, causes him to sin and deprives him of blessings. He presents evidence that it will take him many months to advance past SM-0, secure a prison job, and save enough from his meager wages to purchase a personal television to permit his Jum'ah participation while in Level S status. He also points out that his disciplinary history includes assaultive behavior, making

him ineligible for transfer to the VHU (with access to a communal television for Jum'ah) unless prison administrators grant him an exception. Nothing in the record suggests that such exceptions are common or that Greenhill has any chance of quickly obtaining one. Taking all of this evidence in the light most favorable to Greenhill, I find that he has presented material disputes of fact by which he could show that SM-0 regulations place a substantial burden on his Jum'ah practice. *See Obataiye-Allah v. Va. Dep't of Corr.*, No. 7:15CV00230, 2016 WL 5415906, at *14 (W.D. Va. Sept. 28, 2016) (finding denial of televised Jum'ah at lowest OP 830.A step placed substantial burden on Nation of Islam inmate's practice), *aff'd*, 688 F. App'x 211 (4th Cir. 2017) (unpublished).[8]

I cannot find, however, that Greenhill has met his threshold showing that the VDOC grooming policy is placing a substantial burden on his religious practice to wear a four-inch beard. It is undisputed that Greenhill is currently in segregated confinement because of his many disciplinary infractions and his failure to meet the goals of the Step-Down Program for advancement to less restrictive housing statuses. His beard now exceeds the half-inch beard length limit in OP 864.1, and he can grow and maintain it at a four-inch length, consistent with his beliefs. It is undisputed, however, that his noncompliance with the beard length provision will

---

[8] The plaintiff in the *Obataiye-Allah* case withdrew this RLUIPA claim before appealing the disposition of his unrelated due process claims.

not prevent his progress to less restrictive steps in the Step-Down Program and will not result in more restrictive living conditions than those to which he is already subjected because of his SM-0 status. Thus, Greenhill has presented no disputed fact on which he could show that OP 864.1 is placing "substantial pressure" on him to violate his belief of wearing a four-inch beard. *Lovelace*, 472 F.3d at 187. Accordingly, the defendants are entitled to summary judgment as a matter of law, and I will grant their motion, as to Greenhill's RLUIPA challenge to the VDOC beard grooming requirements.

### 2. Compelling Interest and Least Restrictive Means.

Only if the inmate proves that there is a substantial burden on his religious practice does "the burden shift[ ] to the government to prove its policy furthers a compelling governmental interest by the least restrictive means." *Incumaa*, 791 F.3d at 525.

> RLUIPA . . . contemplates a more focused inquiry and requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person — the particular claimant whose sincere exercise of religion is being substantially burdened.

*Holt*, 135 S. Ct. at 863.

The defendants argue that the VDOC has a compelling interest in the success of Step-Down to motivate inmates to improve attitudes and behaviors — thereby, to maintain order, reduce disruptive and dangerous behaviors, and to

promote inmates' successful re-entry of society after incarceration. I agree that the VDOC has a compelling interest in rehabilitating its prisoners — to further internal safety and security, but particularly to prepare an inmate like Greenhill, who is nearing the end of his prison term, for life outside segregated confinement.[9] Now, I must determine whether the defendants have demonstrated that the Step-Down television restriction in SM-0 is the least restrictive means by which they could further the policy's motivational goals.

RLUIPA's "least-restrictive-means standard is exceptionally demanding." *Id.* at 864. "The least-restrictive-means standard . . . requires the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015).

Courts should not "mechanically accept" prison administrators' rationale for restricting religious exercise." *Lovelace*, 472 F.3d at 190. However, courts must apply RLUIPA standards with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of

---

[9]   According to the VDOC website, Greenhill's projected release date is January 25, 2022. Offender Locator Search Results, https://vadoc.virginia.gov/offenders/ locator/results.aspx (last visited Sept. 18, 2018).

costs and limited resources." *Wright v. Lassiter*, 633 F. App'x 150, 151 (4th Cir. 2016) (unpublished) (quoting *Cutter*, 544 U.S. at 723).

In this context, I find it appropriate to view VDOC religious accommodation policies as a whole, as Greenhill has encountered them throughout his term of confinement. He started his VDOC prison term in institutional settings where VDOC policies allowed him to gather with fellow believers for group religious services. Greenhill squandered that opportunity and committed numerous rule violations and threatening actions that caused officials to reclassify him as a greater security risk. Eventually, his actions resulted in his placement in Level S, where policies bar him from group gatherings with other inmates for security reasons.

Even since moving to Level S, Greenhill has had opportunities (in the Structured Living Phase 1 pod and in the Secure Integration Pod Phase 1) to take actions toward reclaiming the opportunity for group Jum'ah participation. By avoiding disciplinary infractions and participating fully in Step-Down requirements, he might have earned reclassification to a lower security classification where group religious services were available to him. In both circumstances, however, Greenhill's choices (to refuse Step-Down participation and to commit multiple, serious disciplinary infractions) led to his demotion to SM-0. In that status, too, his own actions or inactions have blocked his progress

toward a less restrictive housing situation, including the possibility for a job and other privileges, such as transfer to the VHU.

The defendants have demonstrated that Step-Down procedures in OP 830.A use incentive-based pathways specifically designed for inmates with particular issues that may derail their successful transition after release from prison. The SM pathway is focused to assist those inmates, like Greenhill, with a history of disruptive behavior, fighting, or violence, and a past demonstration of unwillingness or inability to improve their behavior under less restrictive conditions. Such inmates need strong motivational factors to convince them to change, for the improvement of prison order and safety and for their own future success after prison. The defendants argue that since television access is one of the best motivations for inmates to work toward advancement in the Step-Down program, its restrictions, including the television ban in SM-0, "are the least restrictive means of furthering" the state's compelling interest in Step-Down's success in maintaining order, reducing inmates' disruptive and dangerous actions, and promoting successful re-entry to society. Mem. Supp. Suppl. Mot. Summ. J. 14, ECF No. 55. They also contend that "[r]emoving the escalating privilege levels would render the entire incentive-based Step-Down Program ineffective." *Id.* at 15.

Greenhill does not offer evidence in contradiction of the defendants' contention that the television ban is the least restrictive means of furthering the state's compelling interest in motivating him to make positive changes in his thinking and conduct. The Supreme Court has instructed courts to defer to the professional judgment and experience of prison administrators in developing and enforcing effective procedures for inmate management. *Cutter*, 544 U.S. at 723. I am also instructed not to measure any religious accommodation under the RLUIPA standard in such a way as to "override other significant interests." *Cutter*, 544 U.S. at 722. Inmates' rehabilitation and successful re-entry must be counted as such an interest. I conclude that although the television restriction for SM-0 inmates may substantially burden Greenhill's Jum'ah practice, that restriction furthers compelling penological interests by the least restrictive means. Accordingly, I will grant the defendants' Motion for Summary Judgment on Greenhill's RLUIPA claim concerning his Jum'ah participation.

### III. CONCLUSION.

For the stated reasons, it is **ORDERED** that the defendants' Supplemental Motion for Summary Judgment, ECF No. 54, is GRANTED.

A separate Judgment will be entered herewith.

ENTER: September 19, 2018

/s/ James P. Jones
United States District